**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, NJ 07052
(973) 243-8600
Anthony Sodono III
Michele M. Dudas
*Counsel for VoicePulse Inc.,*
*Chapter 11 Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| VOICEPULSE INC., | Case No. 16-25075 (MBK) |
| Debtor. | Hearing Date and Time:<br>September 15, 2016, at 10:00 a.m. |

**CERTIFICATION OF RAVI SAKARIA, PRESIDENT, IN RESPONSE TO "LIMITED OBJECTION" FILED BY UNSECURED CREDITOR KETAN P. PATEL TO MOTION FOR USE OF CASH COLLATERAL**

I, Ravi Sakaria, of full age, hereby certify and state as follows:

1. I am the President and sole shareholder of VoicePulse, Inc., Chapter 11 debtor and debtor-in-possession ("Voice" or "Debtor"). As such, I am fully familiar with the facts set forth herein and submit this Certification in further support of the Debtor's Motion for use of cash collateral ("Motion") and in response to the "Limited Objection" ("Objection") filed by unsecured creditor Ketan P. Patel ("Patel").

2. This Certification also debunks the myths and half-truths of the "head-snapping" allegations set forth in Patel's Objection. Even more incredulous, all of Patel's allegations relate to events more than five (5) years ago! Not only are these allegations contrary to the Agreement (defined below), they are stale and suggest a desperate attempt to paint me in a negative light.

3.  Patel expressly acknowledges that he is an unsecured creditor. At the outset, it should be noted that WebBank, the only secured creditor of the Debtor, did not object to the Motion or Interim Order authorizing use of cash collateral.

4.  I formed the Debtor in April of 2003. The Debtor provides voice over internet based telecom services ("Services").

5.  At the time the company was formed, there was no real competition, and the Debtor was an innovator in this industry. I was the one that designed the creative process and business model to provide residential customers with the Services. I also created and implemented the infrastructure. Through my efforts and my efforts alone, I developed the Voice business.

6.  At the time the Debtor was formed, I had one other employee that assisted with the first working system the company employed.

7.  Soon after that first version was implemented, I hired Patel, my cousin. He never invested any money into the Debtor and for all intents and purposes, was an employee. The fact regarding his "co-founding" the company is in dispute, and always has been.

8.  During the first several years of operations, I worked tirelessly, and had no salary in 2003 and a minimal salary in 2004. In 2005, my salary was $18,000, and it increased to $44,000 in 2006.

9.  At some point after 2006, I explored selling the company, and in 2009 I hired an outside management team to run the operations.

10.  In 2009 or 2010, when I was not involved in the day-to-day operations of the company, there was a fire at a collocation facility, and the Debtor had to rebuild its systems.

Despite me and one other employee building the initial software system, this second effort, without my assistance, required thirteen (13) employees, including Patel.

11. As the only shareholder, I solely was responsible for the decision to hire a Chief Executive Officer ("CEO"). This decision was made, in part, because Patel and his brother had become insubordinate and impossible to manage. Rather than terminating their employment, I attempted to handle the situation by hiring a third party, in or about 2009.

12. After hiring both a CEO and Chief Financial Officer ("CFO"), I instructing them to explore a potential sale of the business. Believed to have been conspiring with Patel and his brother, the only "buyer" that these new employees -- CEO and CFO -- presented were themselves and the Patel brothers. When I realized that this was a likely scheme to obtain ownership of the business, I terminated all four (4) employees and refocused all of my efforts on the business.

13. On October 18, 2010, Patel initiated suit against me in the Superior Court of New Jersey, Middlesex County, Chancery Division, at Docket No. MID-C-208-10 ("Litigation"), for, among other allegations, that he had an ownership interest in the business.

14. It was a contentious and expensive lawsuit from the start. Faced with the costs associated with defending the Litigation, the uncertainty in the length of time and the outcome of the Litigation, and my desire to focus my time and energy on the Debtor's business, I settled with Patel by Settlement Agreement dated November 23, 2010 ("Agreement").

15. The Agreement contains confidentiality clauses and is not attached as an exhibit for that reason. The Debtor and myself, individually, paid certain substantial lump sum payments to Patel, and monthly payments of $11,111.11 since January 1, 2012.

16. The Agreement also provided Patel with a security interest in the Debtor's assets, and a UCC-1 was issued.

17. I returned to the day-to-day operations in late-2010.

18. Under the Agreement, the Debtor produced quarterly financial statements to Patel. The quarterly financial statements were never questioned.

19. Patel and his brother, Nayan, formed KPNP Telecom, LLC ("KPNP") in January 2011. KPNP was a *direct competitor* of Voice. Upon information and belief, the business was a failure and is now defunct.

20. Over the course of the last six (6) years, several issues have affected the Debtor's business. There has been a slow attrition of customers, which accelerated over the last six (6) months. Moreover, there has been increased competition, which has put the Debtor at a strategic disadvantage, because it cannot be price-competitive based upon aging infrastructure.

21. In early 2014, I made the decision to re-write the service platform, which was another complete rebuild of the systems. All aspects of the rebuild were completed by me, and two (2) other employees.

22. The financial conditions were caused by outside sources, and not through a misuse of company assets (an allegation that only Patel has made). In fact, part of the financial issues were caused by the exorbitant monies paid to Patel.

23. Vendors were threatening to disconnect the Debtor's services, which would in turn would have interrupted services to the Debtor's customers. This would have lead to irreparable harm to the Debtor's business. Cash would cease and enterprise value would diminish.

24. Therefore, left with no choice based upon a pending shut-off by a creditor, the Debtor filed its voluntary Chapter 11 Petition on an emergent basis on August 5, 2016 ("Filing Date").

25. In preparing its schedules and determining whether a motion for use of cash collateral was required, it came to my attention that Patel allowed his UCC filed on December 14, 2010 to lapse, as it was not refiled within the five (5) year period.

26. Therefore, as of the Filing Date, Patel was no longer entitled to any security interest in the Debtor's assets, which would have potentially included a lien on cash or cash equivalent.

27. As of the Filing Date, the only payment not made to Patel was the payment due on August 1, 2016. All payments to Patel under the Agreement were always made.

28. As of the Filing Date and for a period of approximately six (6) years prior thereto, I had and currently have the following duties and responsibilities with the Debtor, and dedicate approximately a minimum of eighty (80) hours per week to the Debtor's business:

- Executive Management - all strategic business decisions;
- Operations Management - employees report directly to me;
- Finance Management - all accounting and bookkeeping responsibilities, including payables, payroll and forecasting;
- Lead Software Architect - design and implement all of Voice's software systems;
- Lead Software Developer - write majority of codes that comprise Voice's back-end software. This includes software written in C, C++, C# and Javascript;
- Senior Network Engineer - designed all area networking, senior person for maintaining, and troubleshooting the systems on a daily basis;
- Database Management - architect all back-end databases on platforms including MySQL and Microsoft SQL Server;
- Sales - handle all customer sales. This includes lead generation, development, deal negotiation, and closing;
- Marketing - create marketing content (including our public web site content and online advertising content), and budget and implement online advertising campaigns;
- Customer Support Management - oversee customer support. This includes spot-checking, reviewing, and commenting on customer trouble ticket responses. Create, oversee and improve the support process on a continuing basis; and

- Office Administration - handle general office management and administrative duties.

29. As part of its first day Motions, the Debtor filed the Motion on August 8, 2016 (Docket No. 13), amongst other pleadings ("First Day Motions"). The hearing on the First Day Motions was conducted on August 11, 2016.

30. Counsel to Patel appeared on the return date of the First Day Motions.

31. On August 25, 2016, Patel served a Rule 2004 Subpoena, on me, as President of the Debtor, as well as to Dean Koehler, CPA, the accountant to the Debtor (and myself personally).

32. The Debtor's First Meeting of Creditors was conducted on September 1, 2016 ("Meeting"), and Patel's counsel appeared on that date, as well as on the return date for the Status Conference conducted by the Court on September 12, 2016.

33. On September 9, 2016, Patel filed the Objection.

34. A review of the Objection is nothing more than a transparent and pathetic attempt by Patel, after realizing his security interest lapsed, to present this Court, creditors and interested parties with mere allegations from more than six (6) years ago, in an attempt to thwart the Debtor's business operations and cause me personal harm.[1]

35. The Objection is riddled with spurious allegations.

36. WebBank, the only valid secured creditor, has not objected.

---

[1] The Debtor will not engage in tit-for-tat antics with Patel. As examples of his painting less-than-truthful portrait of the Debtor and me, Patel asserts in the Objection, ¶ 8 and 21, that I "dropped" a "whopping" $55,000 at the Bellagio in Las Vegas. What Patel disingenuously fails to inform this Court was that it was at Patel's bachelor party, which his brother also attended. Furthermore, I claimed said expenses as income on my tax returns. These stale and tasteless accusations are simply to inflate his baseless allegations to gain unnecessary attention of the United States Trustee and creditors. The Agreement with Patel specifically provides that the other party will not disparage the other. The Debtor is investigating this breach of the Agreement and reserves all rights and remedies with respect thereto, as well as any other cause of action, including disgorgement of amounts paid to Patel.

37. There is no basis whatsoever for a reduction in my salary. I am doing the job duties of several employees. I, alone, am improving the Debtor's technological operations for either the sale of the business, or as part of the reorganization efforts to bring the Debtor to updated systems which would provide the best services for its customers and more competitive pricing.

38. After the Litigation was settled, it came to my attention that Patel presented my family and my in-laws with some of the financial and other information produced in the Litigation, in an attempt to disrupt interfamily relations and to harm the Debtor's business.

39. Patel is clearly continuing this course of conduct, through the filing of the Objection.

40. Furthermore, Patel has already started a competitive business, KPNP, and there is concern that he will stop at no end until he ruins the Debtor's operations.

41. Based on the foregoing, it is respectfully requested that the Objection be overruled and the Debtor be authorized to continue using cash on a final basis in accordance with the budget submitted in support thereto.

I hereby certify that the foregoing statements made by me are true. If any of the foregoing statements made by me are willfully false, I am subject to punishment.

**VOICEPULSE, INC.**

By:   Ravi Sakaria
      RAVI SAKARIA

Dated: September 12, 2016

4828-0997-9704, v. 1